JOHN M. RUNFOLA (CSBN 096058)
Pier 9, Suite 100
San Francisco, CA  94111-1497
Telephone:  (415) 391-4243
Facsimile:  (415) 391-5161
john@johmrufola.com

NAOMI CHUNG (CSBN 283743)
Pier 9, Suite 100
San Francisco, CA 94111
Telephone: (415) 746-9080
Facsimile (415) 484-7054
naomichung@defenseaid.com

HILARY BLAMEY (CSBN 325753)
Pier 9, Suite 100
San Francisco, CA 94111
Telephone: (415) 746-9080
Facsimile (415) 484-7054
hilary@defenseaid.com

Attorneys for Defendant
CLIFTON BURCH

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CLIFTON BURCH,<br><br>Defendant. | Case No. 17-CR-00175-CRB-5<br><br>**DEFENDANT CLIFTON BURCH'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE AND DOWNWARD VARIANCE**<br><br>Sentencing Date: July 31, 2020<br>Time: 10:00 a.m.<br>Court: Hon. Charles R. Breyer |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I. THE INDIVIDUAL BEFORE THE COURT

### A. <u>Clifton Burch's Personal History and Background</u>

#### i. *Childhood*

Clifton Burch's life story is one filled with prejudice, anguish, and redemption.  As the youngest of eight children, with parents who worked tirelessly to provide for a big family, Mr. Burch learned to fend for himself at a very young age, starting with walking himself to and from kindergarten at the age of five.  With his parents working full time, Mr. Burch was often left unattended wandering around the home for extended periods of time.  His curiosity as a child led him to have his first sip of alcohol at the age of ten, which almost cost him his life.  His older siblings did little to shelter him from the harsh realities of the world and instead used him as their own punching bag.

Mr. Burch grew up in Daly City, California during the sixties and early seventies, which was a predominantly Caucasian neighborhood, with very few African American families.  PSR ¶ 71.  This imbalance in his neighborhood made him keenly aware of racial inequality at a very young age.  Throughout his childhood he was repeatedly forced to endure the various manifestations of racism – bullying, harassment, assault, and humiliation.

In elementary school, Mr. Burch was often ostracized for being different and regularly bullied by white students because of the color of his skin.  He specifically recalls one incident when he was playing with a friend in the school yard, when an older white kid playing basketball nearby attacked him by throwing a basketball at Mr. Burch's face, which knocked him to the ground.  *See* PSR ¶ 72.  Sadly, this was not an isolated incident, but rather the norm for Mr. Burch.

Such bigotry was not limited to the children, in that even his teachers would single him out for allegedly being disruptive for no reason just to find an excuse to kick him out of the classroom.  Parents of his white classmates were no different. They often chastised Mr. Burch for trying to play with their children and sometimes even falsely accused him of causing trouble in the neighborhood.  Even before entering middle school, Mr. Burch knew all too well what it meant to be a black person living in white America.

Despite experiencing such intolerance and prejudice at a young age, Mr. Burch found a positive outlet in playing sports.  PSR ¶ 72.  He learned to channel the anger that was building up inside of him and releasing it out on the field.  Unsurprisingly, he exceled at every sport he played and by the time he graduated from Jefferson High School in 1986, despite being Black, Mr. Burch had made a name for himself in the community as a decorated athlete.  In fact, in his senior year, he was named "All County" and "All-League" wide receiver in football and was recognized as key player in helping his team clinch the Central Coast Section "CCS" Championship Title.  As a sophomore and junior he led his team to victory by claiming two Peninsula Athletic League championship titles.  Mr. Burch's legacy was not limited to football, he still holds the track and field records for the 400 Relay, Mile Relay, and Long Jump.  In fact, in 2017, Mr. Burch was nominated to join some of Jefferson High School's Hall of Fame as a top athlete.  After high school, Mr. Burch went on to play defensive back at San Mateo College for one year before dropping out to support his newly growing family.

### ii.   Substance Abuse and Criminal Record

Mr. Burch's accomplishments on and off the field only went so far in compensating for the constant racism he endured while living in Daly City.  As a young adult, he became increasingly frustrated and angry over the mistreatment he experienced due to the color of his skin.  Rather than finding a healthy outlet as he had done as a teenager, Mr. Burch made the grave mistake of surrounding himself with seemingly like-minded individuals who influenced him to step into a dark world consumed by drugs and alcohol.  While Mr. Burch had experimented with a variety of drugs in his youth – smoking marijuana for the first time in sixth grade and trying out cocaine in high school to look "cool" – his passion for sports kept him from regularly using drugs.  PSR ¶ 78.  Mr. Burch's decision to join the wrong crowd, led him down an eight-year battle with addiction that almost cost him everything.

At the age of 19, Mr. Burch turned to illegal activity to pay for his drug addiction.  Within two years Mr. Burch picked up two criminal charges for possession of controlled substances and served three years in prison for the later offense.  PSR ¶¶ 59, 61.  About four years later in 1997, Mr. Burch was charged with selling narcotics to an undercover agent for which he

served six years in prison.  PSR ¶ 62.  While serving his sentence, Mr. Burch's father unexpectedly passed away from a stroke, and shortly thereafter his grandmother also passed away.  Mr. Burch was heartbroken thinking about all the time he had lost with them and how disappointed they must have been at his life choices.  At that moment, Mr. Burch realized that this was his rock bottom and he needed to turn his life around.

### iii.  Redemption

Despite never receiving professional treatment for his addiction, Mr. Burch emerged from prison a changed man who was determined to straighten his life out and become a productive member of society.  He followed in his father's footsteps and got a job as a foreman superintendent at a local engineering company.  He worked hard for any opportunity he was given and as a result, quickly rose through the ranks of the company.  Outside of the workplace, Mr. Burch devoted countless hours to further developing his skills by enrolling in classes and learning from other experts in the construction industry.  In 2009 Mr. Burch's hard work finally paid off when he was selected to participate in the CalTrains Mentor Protegee Program.  *See* Exhibit B – Awards at 3.  This two-year program allowed him to learn everything about the construction business.

Finally, in 2003 Mr. Burch found the courage to start Empire Engineering & Construction, his own licensed general contracting business specializing in foundation work such as, grading, excavating, underground utilities, and concrete.  In about ten years, he won numerous contracts with the city and was able to grow the company to almost 45 employees.

Such success did not come easy.  For many years, Mr. Burch battled with himself on a daily basis to keep his commitment to remain sober, not just for himself, but for his loved ones. Since his release from prison, Mr. Burch refused to become involved with drugs or alcohol and devoted himself completely to his work, his family, and his faith.  To this day, his wife of 12 years, Elethia Gentry; his two biological son Dante and Darren; his three grandchildren, Dante Burch Jr. ("DJ") (age 10), Alayah (age 9), and Prince (age 7), and his 86-year old mother Daisey Cole, are Mr. Burch's whole life.  PSR ¶ 73.

Mr. Burch and his wife have a marriage that friends describe as a tender and loving, a relationship that everyone dreams of.  They enjoy temporary custody of Dante Jr. and adopted Alayah when she was only four-months old.  PSR ¶ 73.  When he is not running the business, Mr. Burch dedicates most of his spare time to his grandchildren and is actively involved in their education and sports teams. He has been coaching basketball for 22 years and recently coached the second-grade girls' team and third-grade boys' team at St. John's Catholic School.  He also regularly volunteers at his old high school as a football coach.

Mr. Burch also took pride in being an active member in his community including volunteering at his local church.  Over the past six years, Mr. Burch was an integral part of his community church, devoting both time and money to its welfare.  Every year, Mr. Burch gave more than 10% of his family's earnings to his church and provided security as the Pastors Lead Armor Bearer.  Additionally, he was chosen as a leader of the Men's Ministry Group within the church providing counseling and giving presentations to more than 250 men.  His work with the Men's Ministry Group is dear to his heart because it allows him to mentor men of all ages, races, and economic backgrounds.  He uses this platform to help encourage others that through the love of God anyone can have a second chance at life.  Members of the community describe Mr. Burch as a beloved and respected family man who actively helps others in need, including creating job opportunities through his construction business.  PSR ¶ 74.  Donald Goodwin, Mr. Burch's brother-in-law, has witnessed Mr. Burch "give money, clothes, time, wisdom, spiritual advice and love to those in need. Clifton is one that is always there to lend a helping hand. In fact, Mr. Burch has not only helped out his own race, but he's a helping hand to other races, beliefs, and backgrounds." *See* Exhibit A – Letters of Support at 18.

Due to the instant offense, however, Mr. Burch's main activities at the church have been curtailed which has been a source of considerable amount of emotional pain.

**B. The Present Offense**

In or about 2011, the FBI launched an investigation into former California State Senator Leland Yee, former San Francisco School Board President Keith Jackson, and Raymond "Shrimpboy" Chow and their respective criminal enterprises.  It was during this investigation that

the FBI intercepted a call between Keith Jackson and Derf Butler on April 12, 2013 where they openly discussed and agreed to engage in a bid rigging scheme.  After being introduced to an undercover FBI agent ("UC"), Mr. Butler made several more culpable statements where he proposed they engage in a bid-rigging scheme to win certain government contracts.  Mr. Butler further stated that he would find additional contractors that they could use to execute the scheme. One of the contractors that he had in mind was Mr. Burch.

At the end of July 2013, Mr. Butler approached Mr. Burch via email and asked if he would be willing to attend a meeting with him regarding a potential job opportunity.  Mr. Burch agreed and on July 30, 2013, Mr. Burch met with Mr. Butler, Mr. Kalafati and the UC in San Francisco.  Thereafter, Mr. Burch submitted a bid for $7,125,000, which led to the instant case before the court.

On April 6, 2017, Mr. Burch and his three co-defendants, Derf Butler, Anton Kalafati and Peter McKean, were charged with one count of conspiracy to defraud the United States Department of Energy in violation of 18 U.S.C. § 371.  Dkt No. 1.  Mr. Burch was arraigned on April 17, 2017 and was released on a $50,000 unsecured bond to U.S. Pretrial Services supervision.  PSR ¶ 4.  Mr. Burch has complied with all Court ordered conditions of release. PSR ¶ 4.

More than a year later, on November 8, 2018, the government filed a superseding indictment charging Mr. Burch and Mr. McKean with an additional count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349.  Dkt No. 325.

Mr. Burch and Mr. McKean proceeded to trial on February 4, 2019.  The jury found both defendants guilty of count one and count two of the Superseding Indictment.  PSR ¶ 3.

## II.    GUIDELINE CALCULATIONS AND OBJECTIONS TO THE PSR

Mr. Burch objects to U.S. Probation's calculation of a Total Offense Level of 14, Criminal History Category (CHC) II which results in an advisory guideline range of 18 to 24 months.[1]  **Mr.**

---

[1] According to the PSR, the advisory guideline range would be 18-24 months if the court denies Mr. Burch's motion for a downward departure of his CHC from II to I.

**Burch contends that his Total Offense Level is 10, CHC I, with an advisory guideline range of 6 to 12 months of incarceration –**

| | |
|---|---|
| Base Offense Level, U.S.S.G. §§ 2X1.1(a) and 2C1.1(a)(2) | 12 |
| Adjustment for Mitigating Role, § 3B1.2(b) | -2 |
| Total Offense Level | 10 |
| Criminal History Category | I |
| Guideline Range | 6-12 months |

Mr. Burch contends a downward departure to CHC I is appropriate here because his three criminal history points stem from a single a drug-related conviction dating back more than 22 years for which he served a six-year prison sentence and upon being discharged on March 31, 2004 he was a "law-abiding and productive citizen for just over nine years". PSR ¶ 104. And "[s]ince his discharge, he established strong family and community support along positively contributing to his family and community all of which would indicate that Mr. Burch presents a low risk to recidivate." *Id*. Thus, Mr. Burch hereby requests that this Court grant a downward departure from CHC II to I on the basis that CHC II significantly over-represents the seriousness of his criminal history and the likelihood that he will commit further crimes. *Id*.; U.S.S.G. § 4A1.3.

A.    **A Mitigating Role Adjustment Pursuant to § 3B1.2(b) is Appropriate Here**

Mr. Burch is entitled to a two-level reduction in the Guideline calculation based on his mitigating role in the offense pursuant to U.S.S.G. § 3B1.2(b). Such an adjustment is warranted because unlike his co-defendants, Mr. Burch had no active role in devising or orchestrating the scheme, he only participated in one initial meeting with the UC together with Mr. Butler and Mr. Kalafati but had no further communication with the UC. Additionally, Mr. Burch was never paid any money for his involvement, he was never explicitly promised a project or a specific amount of money, and he is the only one that requested for the specs prior to submitting his bid. Mr. Burch agreed to participate in the scheme in hopes of getting future work for his company by instilling good will with what he believed to be the "right people".

Because the conduct of his co-defendants is relevant to this discussion, each will be briefly summarized below.

Derf Butler clearly played a major role not only in facilitating this scheme but ensuring that it was successfully carried out. He is responsible for orchestrating the bid-rigging scheme by acting as a liaison between the UC and the other co-defendants, and was paid at least $15,000 for his participation, and was caught lying to FBI agents on several occasions.

- The intercepted conversation between Mr. Butler and Keith Jackson where they explicitly discuss the bid-rigging scheme is one of the reasons the FBI decided to launch an investigation in the first place. Mr. Butler made several culpable statements to the UC proposing that they enter into a bid-rigging agreement together and also assured the UC that he would be able to provide the additional contractors necessary to execute the scheme. Mr. Butler assured the UC that once he was given the UC's bid amount that the contractors needed to exceed, "we'll make sure it rolls the way it is supposed to." PSR ¶ 18. Mr. Butler clearly played an active role in *directing and facilitating* orders to ensure that the UC was awarded the contract.

- Mr. Butler actually received money from the UC during the course of the investigation. On July 18, 2018, the UC and Mr. Butler met at a restaurant in San Francisco to discuss the DOE contract. PSR ¶ 17-18. It was during this meeting that Mr. Butler received his first cash payment of $2,000. PSR ¶ 18. Over the course of the next twelve days, however, Mr. Butler was paid a total of $15,000 for his involvement in the scheme. PSR ¶ 29.

- Mr. Butler also lied multiple times to FBI agents during his two non-custodial interviews about his involvement with the UC. What is shocking however, is that he continued to lie to the agents even after they told Mr. Butler that they knew had had previously lied to them about never taking or receiving any money from the UC. PSR ¶ 30.

Anton Kalafati was explicitly promised a $250,000 subcontracting job for his participation in submitting a bid and lied to DOE agents during his April 24, 2014 interview.

- In late January 2014, there was a meeting between Mr. Kalafati, Mr. Butler, and Mr.

McKean where Mr. Butler indicated that Mr. McKean's construction firm, Townsend Management, Inc., was selected to be the prime contractor on the job.  Mr. Butler explicitly informed Mr. Kalafati that he would get a subcontracting job valued at $250,000 for his participation in submitting a bid.  PSR ¶ 32.

- During his April 24, 2014 interview with the DOE, Mr. Kalafati provided a *sworn written statement* that Mr. Butler "did not give me a number that I should come in at" in submitting the bid.  He stated that he took the plans back to his office where he and his assistant came up with the $6.6 million bid after doing a proper take off.   PSR ¶ 33.

While Peter McKean was late to the game, he was explicitly promised $200,000 for his participation in the bid-rigging scheme and he was again explicitly instructed to submit a bit in the amount of $6.2 million.

- The transcript of the meeting between the UC and Mr. McKean on October 1, 2013, it is clear that Mr. McKean agreed to participate in the bid-rigging scheme in exchange for money.  Specifically, the UC told Mr. McKean that if Mr. Butler takes $500,000 out of the estimated $1.4 million profit, that "leaves $900,000 for us."  PSR ¶ 25.  The UC then tells Mr. McKean, "You get 200 grand. You over-seeing it and you got the most risk."  PSR ¶ 25.

**B.**   **Acceptance[2] & Obstruction of Justice Enhancement Pursuant to § 3C1.1 Does Not Apply to Mr. Burch**

Mr. Burch should not be punished with a two-level enhancement for Obstruction of Justice pursuant to U.S.S.G. § 3C1.1.  The obstruction charge in this case stems from prior counsel's failure to adequately prepare his client to take the stand.  Mr. Burch disclosed to this Court that there was a complete breakdown in communication with prior counsel and that he received no meaningful preparation before he took the stand.

In *United States v. Dunnigan*, 507 U.S. 87 (1993), the Supreme Court concluded that in order for the Obstruction enhancement to apply, a court must make an independent determination

---

[2] Mr. Burch withdraws his objection to the PSR that he is eligible to receive a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1.

9

that the defendant's testimony was willful, material to the investigation or prosecution, and made with the specific intent to obstruct justice. *Dunnigan*, 507 U.S. at 95. A jury's rejection of a defendant's testimony regarding his point of view or his recollection of events is insufficient to apply the Obstruction enhancement. *Id*. Additionally, not every accused who chooses to testify at trial will incur an enhancement under § 3C1.1. In some cases, an accused may give inaccurate testimony due to confusion, mistake, or faulty memory. *Id*.

Mr. Burch testified to the best of his recollection as to the events in this case. However, due to his prior counsel's lack of preparation he often stumbled and was confused by the government's line of questioning. This does not mean that Mr. Burch's testimony was untruthful with respect to material matters in this case. The government has taken advantage of combing through Mr. Burch's trial testimony in order to select key lines that give the overall appearance that he was untruthful when that is not the case. Just because he was involved in a bid-rigging scheme does not mean that he did not do an actual take off from the blueprints he received.

III.     **APPLICATION OF 18 U.S.C. § 3553(a) AND SENTENCING REQUEST.**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487, 131 S. Ct. 1229, 1240 (2011) quoting *Koon v. United States*, 518 U.S. 81, 113 (1996).

Indeed, a sentencing court is required to "impose a sentence sufficient, *but not greater than necessary*," to comply with the sentencing purposes of punishment, deterrence, protecting the public from further crimes of the defendant, and providing the defendant with needed educational, medical, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a). (emphasis added). And in determining whether to grant Mr. Burch's requested sentence, the Court is respectfully asked to base its decision on the totality of the factors present in this case, and to consider the offender as well as the offense, keeping in mind that it is not "severe punishment that promotes respect for the law, it is appropriate punishment." *United States v. Olhovsky*, 562 F.3d 530, 551 (3rd Cir. 2009) (emphasis in original).

Here, Mr. Burch asks this Court to impose a sentence of six months in home confinement with electronic monitoring, followed by three years of supervised release. This would allow him to continue providing for his family and employees, give back to his community, stay safe from the COVID-19 pandemic, while still punishing him.

### A.   History and Characteristics of the Defendant

#### i.   *Burch is a loving and devoted husband, father, grandfather, and son*

After hitting rock bottom with the loss of his father and grandmother, Mr. Burch emerged from prison determined to be a changed man and a better father to his son, Dante Burch. Mr. Burch gained full custody of Dante upon his release and the two became actively involved in their local church, attending services every week together. Mr. Burch's wife, Elethia, recalls seeing Mr. Burch and Dante at church and was inspired by how seriously Mr. Burch took his role as being a single parent and the pride he had for raising his son. Elethia remembers, "[a]fter observing Clifton for several years, I witnessed he was a loving father, son, a hard worker, a person willing to serve others, dependable, he operated with integrity, but most of all he loved God." *See* Exhibit A – Letters of Support at 3.   Mr. Burch married Elethia in 2008 and the couple enjoy a relationship that has withstood the test of time.

Two years after their marriage, the couple received some unexpected news, Child Protective Services was set to remove their four-month old granddaughter, Alayah Burch, from the custody of Mr. Burch's son, Dante and his girlfriend. Without any hesitation, Mr. Burch and Elethia opened their home and their hearts to this baby to give her a fighting chance. They not only provided Alayah with a loving and nurturing environment, but Mr. Burch encouraged his son to follow the court's orders in hopes of reunification in the future. Mr. Burch did not want his son to make the same mistakes he had and later regret all the time he lost with his daughter. When his son lost all parental rights, Mr. Burch and Elethia decided to adopt Alayah and raise her as their own. Over the years Elethia has witnessed Mr. Burch "pour so much love into his grandchild and daughter. He has been there for her entire life, helping with homework, coaching her basketball team, cheering her on as a cheerleader, and picking her up from school. He has been her biggest advocate." *See* Exhibit A – Letters of Support at 3.

Three years after adopting Alayah, Mr. Burch and Elethia were asked again if they would be willing to open their home up for their grandson, DJ, which they agreed to without a second thought.  Over the last five years, Mr. Burch transitioned from being a grandfather to more of a father figure for DJ and has continued to support him in every aspect of his life.  Every day, Mr. Burch and Elethia strive to make sure that they have a well-structured home where the children can flourish.  This includes having family dinner together every night, attending weekly church services, and having extra family time with one another.  Mr. Burch is not only a role model to Alayah and DJ, but he is their sense of security and stability that they need in their life.  Mr. Burch has sacrificed so much over the years to ensure that Alayah and DJ are given the opportunities they deserve to have the best life possible.

Since the passing of his father in 1998, Mr. Burch has taken on the role as primary care provider for his mother, Daisey Cole, who is 86 years old.  Mr. Burch pays for his mother's car note, doctor appointments, and visited her monthly in Reno, Nevada before the coronavirus pandemic to make sure she had everything she needed.  In March 2018, Mr. Burch received some terrible news – his mother was diagnosed with a rare blood infection and was given two years to live.  During this daunting transition period, Mr. Burch was made his mother's power of attorney and was there for her every step of the way.  He made arrangements for her at a rehabilitation center and was there the day she was released.  To make matters worse, his mother is the sole provider for her current husband, who is suffering from Alzheimer's and dementia.  To say that his mother depends on Mr. Burch's well-being would be an understatement.  Mr. Burch's compassion and love for his family knows no limits and is selflessness is something that is truly remarkable.

### ii.   *Burch is an Employer and Pillar of the Community*

Mr. Burch is the "heart and soul" of Empire Engineering and Construction.  He started the business in 2003 and worked extremely hard to grow the company over the last ten years before the instant offense.  He is the principal person responsible for not only its success, but its very existence.   Karwanna Dyson, a fellow church member, states that

[w]hen I think about all the odds you have to beat as an African American male

growing up in the inner city, I see him as a hero that other African American men look up to because he beat those odds and he established a beautiful legacy for his family. Cliff has received several awards and acknowledgements for his [company's] achievements and successes.

*See* Exhibit A – Letters of Support at 36; *also see* Exhibit B – Awards.

While the company is still in operation, it took a tremendous hit as a result of this case. Mr. Burch not only lost thirty of his best employees but many of his contracts worth millions of dollars were pulled by the city. What concerns Mr. Burch the most about what affect the case has on his company is ensuring that he is able to pay and support his employees. His Chief Financial Officer for Empire Construction, Michelle Metoyer, has witnessed Mr. Burch "take money out of his person account to ensure that payroll is met for our employees [and] that the business continues to stand." *See* Exhibit A – Letters of Support at 48. Mr. Burch's concern for others has always been and will always be the main force of what drives him every day. Indeed, he started the company not only to provide a better life for his family but also to give back to the community at large. Just like he was mentored by other contractors in the business when he was first started out, Mr. Burch continues to make himself available to anyone who needs assistance whether it be through mentoring or a providing a job to someone in need.

Mr. Burch's service to his community is something that makes him a remarkable person. Through his company's hard work and prosperity Mr. Burch was able to donate a substantial amount of money to local community projects and help finance local athletes. His dedication to his community does not stop there, however. Most of the employees he hired to work for his company have all been local men and women from the Inner-City neighborhood of Bay View Hunters Point. He also employed many individuals who were trying to re-enter the workforce after serving some time in prison. Mr. Burch recognizes and is thankful for all the opportunities that were given to him when he was trying to turn his life around and therefore, wants to be the beacon of hope for others going through similar transition periods.

If Mr. Burch was available to continue to run his business, the jobs of his current employees would be saved, and the company could grow once again. In *United States v. Milikowsky*, 65 F.3d 4 (2nd Cir. 1995), the Circuit Court determined that a downward departure

13

in the case was warranted, concluding that imprisonment of the defendant – as the Guidelines indicated – would irreparably harm the defendant's company's innocent employees.  Similarly, if Mr. Burch were to be imprisoned, his employees would lose their jobs, impacting not only them, but their families as well.  There are alternative ways to hold Mr. Burch accountable for his conduct without destroying the financial well-being of his employees.  It is a circumstance worthy of a downward variance.

It is also noteworthy that Mr. Burch became the president of "Classic Car Club," a foundation that puts on fundraisers around the Bay Area to raise money for low-income schools in the community.  Notably within this last year, his charity raised about $5,000 for Willie Brown Middle School and around $15,000 for Longfellow Middle School.

### iii.  Mr. Burch is a religious leader

After receiving no profession treatment for his substance abuse, Mr. Burch dedicates his sobriety to his faith in God and his active involvement in his community church.  For the past six years, Mr. Burch has been an active member of the Faith Fellowship Church in San Leandro, California.  He was an Armor Bearer for the Senior Pastor of the church and was selected to be a leader and spokesperson of the Men's Ministry.  As a spokesperson, he was able to mentor men of all ages, races, economic backgrounds and spoke openly about his own person struggles and how his faith allowed him to have a second chance at life.  Pastor Gary Mortara, states that Mr. Burch "is highly valued and loved by our entire church family which numbers about 2,000 people."  *See* Exhibit A – Letters of Support at 39.  Mr. Burch's commitment to his church was so evident that "in 2012 he was appointed as a biblical Armor Bearer for the Pastor, which is the closest personal role a member can serve in support of their spiritual leader."  *See* Exhibit A – Letters of Support at 40.

This conviction, unfortunately, caused Mr. Burch's main activities at the church to be curtailed and as a result, has caused a considerable amount of emotional pain.  Mr. Burch is grateful, however, to have found a new church that has welcomed him and supported his spiritual growth and passion for giving back to his community.  Prior to the COVID-19 outbreak, Mr. Burch and his family were attending weekly Sunday services and participating in prayer groups.

1

      **B.**    <u>**Nature and Circumstances of the Offense**</u>

2           This Court is aware of all the nature and circumstances of this case, which stems from a

3 sting operation directed at rooting out corruption in public dealings.  While Mr. Burch recognizes

4 the seriousness of his criminal conduct, there are also mitigating circumstances that warrant a

5 downward variance.  Mr. Burch did not seek out Mr. Butler or the UC to get involved in a bid-

6 rigging scheme.  There is also no evidence to suggest that he was already engaged in criminal

7 conduct that would suggest he was predisposed to participating in such a scheme.  Instead, Mr.

8 Burch is before this Court because he made the mistake crossing a line, he knew he should not

9 cross, in hopes of more bringing in more work for his company.

10       **C.**    <u>**Incarceration is Not Required to Reflect the Seriousness of the Offense, Promote**</u>

11               <u>**Respect for the Law, and Provide Just Punishment.**</u>

12          Mr. Burch committed an offense which he will regret for the rest of his life.  He was

13 indicted on April 6, 2017 and since that date he has been dealing with the collateral punishment

14 of his criminal conduct.  He now prays for a sentence of home confinement with electronic

15 monitoring.  Through such a sentence, Mr. Burch's liberty will be sufficiently restricted for a

16 period of time followed by a term of supervised release.  Indeed, such a sentence will have a

17 restrictive, punitive, and rehabilitative effect for many years to come.

18          As noted in *Gall v. United States*, 552 U.S. 38 (2007), while a term of probation is less

19 severe than a term of incarceration, it is nonetheless a significant punishment as it substantially

20 restricts an individual's liberty.[3]  *Id*. at 48-49.  The Supreme Court explained that offenders on

21 supervised release, like the probationer in *Gall*, "may not leave the judicial district, move, or

22 change jobs without notifying, and in some cases receiving permission from, their probation

23 officer or the Court.  They must report regularly to their probation officer, permit unannounced

24 visits to their homes, refrain from associated with any person convicted of a felony, and refrain

25

_____

26 [3] In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court affirmed the district court's
probationary sentence where the advisory guidelines range was 30 to 37 months of imprisonment,

27 recognizing that "[p]robation is not granted out of a spirit of leniency" nor is probation "merely
'letting an offender off easily.'"  *Id. at* 48 n.4 (citing Advisory Council of Judges of National

28 Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957)).

from excessive drinking." *Id.* Similarly, the Ninth Circuit has recognized that even a sentence of probation is a significant sanction. In *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010), the court concluded that the "fact of a felony conviction," plus probation with appropriate conditions are measures sufficient, but not greater than necessary to achieve the objectives in 3553(a). Here, Mr. Burch is requesting a sentence of six months in home confinement with electronic monitoring followed by three years of supervised release.

Moreover, in imposing "just punishment" for his offense, this Court should account for the collateral punishment that Mr. Burch has, and will sustain as a result of his federal conviction. Over the past three years, Mr. Burch has painfully watched the deterioration of his 17-year construction business. The company lost all but two construction projects resulting in a loss of approximately $11 million in gross revenue. Exhibit C – Loss of Business. Due to the lack of work, Mr. Burch was forced to let go of nearly 70% of his employees. As of the date of this filing, only 15 employees remain at Empire Construction and every single one of them depend on Mr. Burch for their livelihood.

However, Mr. Burch's ability to generate business for his company was impeded well before he proceeded to trial. By November of 2017, the Department of Energy revoked his DOE status which effectively made Mr. Burch ineligible to work on any state or federal construction projects.[4] Similarly, the Small Business Administration (SBA) indefinitely revoked his ability to obtain 8A certification by expelling him from their nine-year program.[5] Mr. Burch had already completed about 5 out of the 9 years before he was expelled.

Mr. Burch's reputation has been irreversibly damaged. His mistakes were repeatedly publicized by the press for everyone to read about. He was forced to step down from his position on the Local Business Enterprise Advisory Committee (LBEAC). His foundation lost

---

[4] https://beta.sam.gov/exclusions/S4MR8NRCG%2BNA%2B2%2BNA?keywords=Empire%20Engineering%20%26%20Construction&sort=-relevance&index=ei&is_active=true&page=1 (accessed on July 23, 2020).

[5] https://beta.sam.gov/exclusions/S4MR63TY8%2BNA%2B1%2BNA?keywords=Empire%20Engineering%20%26%20Construction&sort=-relevance&index=ei&is_active=true&page=1 (accessed on July 23, 2020).

1  sponsorships and partnerships with nonprofit entities such as Good Samaritan.  He even

2  experienced discrimination from the place where he expected it the least – his church.

3        Unsurprisingly, the overwhelming stress and anxiety has adversely affected Mr. Burch's

4  physical and mental health.  After months of visiting his physician due to relentless headaches,

5  aching all over his body and severe exhaustion, Mr. Burch was diagnosed with severe anxiety and

6  stress.  Around April of 2019, his physician prescribed sertraline to help manage the symptoms

7  which Mr. Burch is still taking to his day.  He also began seeing a therapist around the same time

8  to help him better manage all the stress in his life.

9        *Finally*, Mr. Burch will face what has been described as the "civil death", which includes

10  not only the loss of rights, but also the imposition of  penalties, disabilities, and disadvantages on

11  convicted felons from "nearly 50,000 federal and state statutes and regulations [nationwide]" as

12  well as the relentless discrimination that convicted felons face as they attempt to re-integrate into

13  the mainstream society and economy.  *United States v. Nesbeth*, 188 F. Supp. 3d 179 (E.D.N.Y.

14  May 24, 2016) (internal citation omitted) at 184.  It is significant that "[o]f those, federal law

15  imposes nearly 1,200 collateral consequences for convictions" since this is Mr. Burch's only

16  federal conviction.  *Id*.  A congressional report authorized by the United States Government

17  Accountability Office (GAO) demonstrates that there are 641 collateral consequences of a

18  nonviolent felony conviction.[6]  Of these 641 collateral consequences, the GAO found that 487

19  (78 percent) of them may potentially last a lifetime." *Id*. at 2.

20       **D.**     **Incarceration is Not Necessary to Afford Adequate Deterrence and Protect the**

21             **Public**

22        Congress has instructed that, in fashioning an appropriate sentence, the Court should

23  consider the need for deterrence and protection of the public from the possibility that the

24  defendant will commit additional crimes in the future.  It is a common misconception that

25  imprisonment is necessary to achieve deterrence.  To the contrary, prisons do not deter very well.

26  In one of the best studies of specific deterrence, which involved federal white-collar defendants in

27  the pre-guidelines era, there is no difference in deterrence between probation and imprisonment.

28

---

[6] Available at https://www.gao.gov/assets/690/687003.pdf at pg. 2 (accessed on July 23, 2020).

1   *See* David Weisburd, et al., *Specific Deterrence in a Sample of Offenders Convicted of White-*
2   *Collar Crimes*, 33 Criminology 587 (1995).

3        Research also shows that he Guidelines' requirement for a term in prison in nearly every
4   case is unnecessary and counterproductive.  *See* U.S.S.C., Alternative Sentencing in the Federal
5   Criminal Justice System, 20 (2009) ("alternatives to incarceration can provide a substitute for
6   costly incarceration," and "also provide those offenders opportunities by diverting them from
7   prison (or reducing time spent in prison) and into programs providing the life  skills and treatment
8   necessary to become law-abiding and productive members of society.")  Empirical evidence
9   demonstrates that a prison sentence may diminish strong family ties and community support,
10  meanwhile effectuating the criminogenic effect by placing nonviolent offenders – like Mr. Burch
11  – near more serious and violent offenders in prison.  *See*, Lynne M. Vieraitis, et al., *The*
12  *Criminogenic Effects of Imprisonment: Evidence from State Panel Data* 1974-2002, 6
13  Criminology & Pub. Pol'y 589, 591-93 (2007) ("imprisonment causes harm to prisoners,"
14  isolating them from families and friends, making it difficult to successfully reenter society, and
15  "reinforce[ing] criminal identities" through contacts with other criminals).

16       A prison term in this case will only serve to inhibit Mr. Burch's rehabilitation, as it would
17  isolate him more from his family, church, and community.  Here, there is no need for a prison
18  sentence to achieve specific deterrence.  Mr. Burch deeply regrets the decisions he made that led
19  him before this Court.  He sincerely hopes that the contentious circumstances surrounding his
20  relationship with prior counsel and his decision to proceed to trial do not detract from the remorse
21  he feels for his criminal conduct.  Indeed, Mr. Burch is a chastened man who regrets his past
22  mistakes, wants to serve as a good example for his grandchildren and those in his community that
23  have supported him over the years.

24       There is no need to incarcerate Mr. Burch to protect the public.  In the past three years this
25  case has been pending, Mr. Burch has continued to be a loving son, husband, father, and
26  grandfather as evident by the numerous letters of support submitted to this Court. He has also
27  been an asset to his community in countless ways from fundraising to support low-income
28  schools to organizing events involving minority firefighters and cool robotics to expose children

18

in low-income neighborhoods to positive role models and encourage them to dream big.  He even helped set up a mobile library for children in the community.  He also mentors four contractors through the Renaissance Entrepreneur Center by sharing all the business and industry knowledge he has accrued over the years.  Mr. Burch believes that the one blessing from his federal conviction is the opportunity to use it as a "teachable moment on what not to do" when working with younger contractors.

Finally, the idea of sentencing Mr. Burch to a harsher penalty to deter others – does not work.  This is because would-be criminals are not aware of penalties for their prospective crimes, do not believe they will be apprehended and convicted, and simply do not consider sentencing consequences in the manner one might expect of rational decision makers.  *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Justice 1, 28-29 (2006) (citing articles published in 1980, 1998, 1999, and 2003).[7]

**E.    The Exceptional Circumstances Presented by the COVID-19 Pandemic Warrant A Non-Custodial Sentence**

The world has drastically changed due to the COVID-19 pandemic.  As of July 24, 2020, there are a reported 15,296,926 million COVID-19 cases worldwide, with a reported 3,938,094 million confirmed cases and 142,553 deaths in the United States alone.[8]  Cases of coronavirus in California and rates of hospitalization have risen sharply in the last month.  On July 13, 2020, the Governor of the State of California Gavin Newsom announced re-closures amid a spike in COVID-19 cases across the state, "we're seeing an increase in the spread of the virus, so that's why it's incumbent upon all of us to recognize soberly that COVID-19 is not going away any

---

[7] While *certainty* of getting caught and punished deters crimes, all empirical research shows that harsher sentences deter virtually nothing at all: "[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects … Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence." *Id.*

[8] *See* World Health Organization, Coronavirus disease (COVID-19) pandemic, https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (accessed on July 24, 2020); *see also* Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (accessed on July 24, 2020.

1  time soon until there is a vaccine or an effective therapy".[9]

2         Further troubling for Mr. Burch is that emerging studies indicate that the virus may be

3  viable for hours in the air and spreading primarily via respiratory droplets among close contacts

4  which is particularly concerning for those who reside in small confined spaces with poor

5  ventilation such as jails and prisons.[10]  And it is a fact that the recommended social distancing

6  measures are nearly impossible to implement and adhere to in jail and prison facilities where

7  inmates share dining, bathing, and sleeping areas, and proper testing for the virus in the prisons

8  remains largely unavailable.

9         Thus, it is not surprising that the consensus among public health experts is that it is critical

10  to reduce incarceration in order to contain the spread of the virus.  *See* Declaration of Chris

11  Beyrer, M.D., MPH, Professor of Epidemiology at Johns Hopkins University, at ¶17, attached

12  hereto as Exhibit D.  Indeed, the risk of infection and accelerated transmission of COVID-19

13  within jails is extraordinarily high because correctional officers and healthcare workers enter

14  these facilities daily.  *See* Declaration of Dr. Brie Williams, Professor of Medicine at the

15  University of California, San Francisco, at ¶ 5, attached hereto as Exhibit E.  The medical

16  treatment capacity of jails and prisons are not at the same level as in a hospital, and even those

17  that have healthcare centers can only treat relatively mild types of respiratory problems for a very

18  limited number of people.  *Id*. at ¶¶ 17-18.  In sum, jails "are fundamentally ill-equipped to

19  handle a pandemic."  *Id*. at ¶ 17.

20         As this Court is well aware, COVID-19 is already in our federal prisons.  The increasing

21  COVID-19 statistics in these prisons all over the country proves that no BOP facility will be able

22  to adequately protect a high-risk individual like Mr. Burch from contracting the virus nor can they

23  provide the necessary medical treatment if he becomes severely ill and complications arise.  This

24  is particularly troubling for Mr. Burch because he suffers from obesity and hypertension which

25  according to the CDC places him at high risk of severe illness if infected with COVID-19.  Mr.

26

27  _____
[9] http://academic.oup.com/cid/article/45/8/1047/344842 (accessed on July 23, 2020).
28  [10] https://www.medrxiv.org/content/10.1101/2020.03.09.20033217v1.full.pdf (accessed on July 23, 2020).

1  Burch has a BMI of 32.1[11] and the CDC states that "[h]aving obesity, defined as a body mass

2  index (BMI) of 30 or above, increases your risk of severe illness from COVID-19"[12].  Mr. Burch

3  was also diagnosed with hypertension back in 1991 and since then has been intermittently taking

4  a drug called Dyazide to manage his blood pressure.  Even more troubling is that hypertension

5  combined with an underlying health condition such as obesity also places Mr. Burch at higher

6  risk of severe illness from COVID-19.[13]  Indeed, the CDC's website has a "Frequently Asked

7  Questions" page which addresses many questions including *Are people with high blood pressure*

8  *(hypertension) at higher risk from COVID-19?"  Id.*  CDC's response is as follows:

9        At this time, we do not think that people with high blood pressure and no other
          underlying health conditions are more likely than others to get severely ill from
10        COVID-19. **Although many people who have gotten severely ill from COVID-
          19 have high blood pressure, they are often older or have other medical**
11        **conditions like obesity**, diabetes, and serious heart conditions that place them at
          higher risk of severe illness from COVID-19.

12  *Id*. (emphasis added).   And while Mr. Burch is not over the age of 65, at the age of 52 he is

13  certainly not young and has been taking an anti-depressant since last year to deal with all the

14  stress and anxiety in his life.

15        A just punishment in Mr. Burch's case – given the nonviolent nature of his offense, and

16  the absence of any losses incurred by a specific victim – does not warrant a sentence that includes

17  his exposure to a life-threatening virus, particularly when he is suffers from a medical condition

18  that substantially diminishes his ability to provide self-care within the environment of a

19  correctional facility.  In fact, the Eighth Amendment's prohibition on cruel and unusual

20  punishment includes unreasonable exposure to dangerous conditions in custody.  *See Helling v.*

21  *McKinney*, 509 U.S. 25, 28 (1993) (The Supreme Court held that exposure to environmental

22  threats to an incarcerated person's physical well-being where exposure is preventable could

23  constitute a violation of the Eighth Amendment's prohibition against cruel and unusual

24  punishment).  If Mr. Burch is sentenced to imprisonment, he will be housed at a BOP facility

25

26

27  [11] Mr. Burch is 5'11 and weighs 230 pounds which results in a body mass index of 32.1.
    [12] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-
    conditions.html#obesity (accessed on July 24, 2020).
28  [13] https://www.cdc.gov/coronavirus/2019-ncov/faq.html#COVID-19-and-Hypertension (accessed
    on June 11, 2020).

1   which will be unable to adequately protect him from contracting COVID-19.  And where

2   protection from COVID-19 for incarcerated inmates are insufficient, as it will be the case for Mr.

3   Burch's incarceration, a sentence of home confinement is both sufficient and appropriate to fulfill

4   the purposes of sentencing under § 3553(a).

5   **IV.     CONCLUSION**

6          For the foregoing reasons, Mr. Burch requests this Court to sentence him to six months in

7   home detention with electronic monitoring, followed by three years of supervised release.

8

9   DATED:  July 24, 2020                           Respectfully Submitted,

10

11                                                  _/s/_____
                                                    JOHN M. RUNFOLA
12                                                  Attorney for CLIFTON BURCH

13   DATED:  July 24, 2020                          Respectfully Submitted,

14

15                                                  _/s/_____
16                                                  NAOMI CHUNG
                                                    Attorney for CLIFTON BURCH
17

18   DATED:  July 24, 2020                          Respectfully Submitted,

19

20                                                  _/s/_____
21                                                  HILARY BLAMEY
                                                    Attorney for CLIFTON BURCH
22

23

24

25

26

27

28